UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JOSHUA D. NELSON,

                   Petitioner,

v.                                 Case No:  2:11-cv-327-Ftm-29CM

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS and ATTORNEY
GENERAL, STATE OF FLORIDA,

                   Respondents.[1]
_____/

## OPINION AND ORDER

This case is before the Court on an amended petition for habeas corpus relief ("the Petition") filed by Petitioner Joshua D. Nelson ("Petitioner" or "Defendant") (Doc. 36, filed December 3, 2012).  Upon consideration of the petition, the Court ordered

---

[1] Rule 2(a) of the Rules Governing Section 2254 Cases in United States District Courts (hereinafter the "Rules") provides that applicants in "present custody" seeking habeas relief should name "the state officer having custody of the applicant as respondent." The Supreme Court has made clear that there "is generally only one proper respondent to a given prisoner's habeas petition." Rumsfield v. Padilla, 542 U.S. 426, 435 (2004). This is "'the person with the ability to produce the prisoner's body before the habeas court.'" Id. at 435–436. When the petitioner is incarcerated and challenges his present physical confinement "the proper respondent is the warden of the facility where the prisoner is being held, not the attorney general or some other remote supervisory official." Id. at 436 (citations to other authorities omitted).  Alternatively, the chief officer in charge of the state penal institution is also recognized as the proper named respondent. Rule 2(a), Sanders v. Bennet, 148 F.2d 19 (D.C. Cir. 1945). In Florida, the proper Respondent in this action is the Secretary of the Florida Department of Corrections. Thus, the Florida Attorney General will be dismissed from this action.

Respondent to show cause why the relief sought in the petition should not be granted (Doc. 42). Thereafter, Respondent filed a response in compliance with this Court's instructions and with the Rules Governing Section 2254 Cases in the United States District Courts (Doc. 47). Petitioner filed a reply (Doc. 56).

Petitioner raises ten claims[2] for relief in his petition. He alleges that: (1) his Sixth Amendment right to confrontation was violated by the erroneous admission of his co-defendant's out-of-court statements; (2) he was deprived of his constitutional right to a fundamentally fair trial because of the admission of faulty DNA evidence; (3) the trial court failed to find Petitioner's history of alcohol and drug abuse to be a mitigating circumstance in the sentencing order; (4) the trial court erred in finding that there was sufficient evidence to support the cold, calculated, and premeditated aggravating factor; (5) the heinous, atrocious, or cruel aggravating circumstance did not apply because Petitioner intended to knock the victim unconscious before he was stabbed; (6) the jury received an unconstitutionally vague jury instruction on the heinous, atrocious, or cruel aggravating circumstance; (7) counsel was ineffective for failing to ensure that Petitioner was

---

[2]Although the claims in the petition are labeled as Claims One through Eight, Claim Seven contains three separate claims of ineffective assistance of counsel. To avoid confusion and to remain consistent with the petition, the separate claims in Claim Seven will be labeled as Claim Seven(a), Claim Seven(b), and Claim Seven(c).

tried and sentenced before a fair and impartial jury; (8) trial counsel was ineffective for failing to request that the jury be sequestered between the guilt and penalty phases of Petitioner's trial; (9) trial counsel was ineffective for failing to ensure the presence of Petitioner's mother and step-father at the penalty phase of trial; and (10) his death sentence is in violation of the Eighth Amendment because an equally culpable codefendant received a life sentence.    Because this Court can adequately assess Petitioner's claims without further factual development, an evidentiary hearing will not be conducted. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003).

**I.    Statement of the Facts**

The facts adduced at trial, as set forth by the Florida Supreme Court, are as follows:

> The evidence presented at trial established the following facts. Nelson and Keith Brennan wanted to leave the city of Cape Coral. The two devised a plan to murder Tommy Owens and steal his car. Nelson and Brennan knew that Owens kept a baseball bat in his car. On the evening of March 10, 1995, Owens was lured under false pretenses to a remote street. Nelson and Brennan were able to convince Owens to exit his car, whereupon Nelson hit Owens with the bat. After a number of blows, Owens eventually fell to the ground. Nelson and Brennan tied Owens' legs and arms. Owens pleaded for his life, stating that the two could take his car. After a brief discussion, Nelson and Brennan concluded that to avoid being caught, they should kill Owens. Brennan attempted to slice Owens' throat with a box cutter. Owens was not unconscious when the

3

attacks began and he begged Nelson to hit him again with the bat so as to knock him unconscious before the stabbing continued. Nelson did as Owens requested and Brennan continued to attack Owens with the box cutter. Nelson and Brennan also continued to strike Owens a number of times with the bat. The two eventually dragged Owens' body to nearby bushes, where Owens later died.

Nelson and Brennan picked up Tina Porth and Misty Porth and the four left the city in Owens' car. After stopping in Daytona Beach, the four left the state and drove to New Jersey. At different times during the trip, Nelson and Brennan informed Tina and Misty that they had murdered Owens. Both Tina and Misty testified at trial.

Nelson and Brennan were apprehended by law enforcement officers in New Jersey. Nelson gave a video- and audio-taped confession. In the confession, Nelson detailed his account of the murder, both at the crime scene and at the place where the bat was recovered. The video-taped confession was played to the jury. Additionally, an analyst for the Florida Department of Law Enforcement testified that blood stains on Nelson's shoes, the box cutter, and a pair of underwear that the box cutter was wrapped in all matched Owens' DNA.

Nelson was found guilty of first-degree murder and robbery with a deadly weapon. At the penalty phase, the jury recommended death by a twelve-zero vote.

. . .

The trial court followed the jury's recommendation and imposed the death penalty for the first-degree murder conviction. The trial court sentenced Nelson to 189 months in prison for the robbery conviction.

Nelson v. State, 748 So. 2d 237, 239-40 (Fla. 1999).

## II.  **Procedural History**

On or about April 4, 1995, Petitioner and his co-defendant Keith Brennan ("Brennan") were indicted for first degree premeditated murder (count one), first degree felony murder (count two), and robbery with a deadly weapon (count three) (Ex. A1 at 1-2).[3]  A jury trial was held, and Petitioner was found guilty as charged on each count of the indictment (T. at 989-90).

A penalty phase commenced on November 7, 1996 (Ex. A10-A13). Following the penalty phase, the jury unanimously recommended death (P. at 234).  After a Spencer[4] hearing, the trial court sentenced Petitioner to death (Ex. A12 at 1083-1106).[5]  He was

---

[3] Unless otherwise noted, references to the record will be made by citing to the exhibits and appendices filed by Respondent on October 16, 2013 (Doc. 51).  References to the trial, found in exhibits A14-A18 will be cited as (T. at __). References to the penalty phase hearing found in exhibits A10-A13 will be cited as (P. at ___).

[4] Spencer v. State, 615 So. 2d 688 (Fla. 1993) (a trial judge may not formulate his or her sentencing decision prior to giving he defendant an opportunity to be heard).

[5] In its sentencing order, the trial court found three aggravating factors: (1) the murder was committed in the course of a robbery; (2) the murder was especially heinous, atrocious, or cruel (HAC); and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification (CCP). The trial court also found that one statutory mitigator (age of eighteen at the time of the crime) and fifteen nonstatutory mitigators were established.  The non-statutory mitigators were: (1) Petitioner voluntarily confessed; (2) Petitioner was not the person who killed the victim; (3) the victim's death was caused by Petitioner's co-defendant; (4) Petitioner suffered from a deprived childhood to the detriment of his personal development; (5) Petitioner's childhood and

sentenced to 189 months in prison for the robbery conviction
Nelson, 748 So. 2d at 240.

Petitioner raised seven claims on direct appeal (Ex. A21).
Petitioner argued that: (1) the trial court erred by failing to
properly determine the admissibility of testimony by the State's
DNA expert; (2) the trial court violated Petitioner's right to
confrontation by admitting evidence of his non-testifying co-
defendant's out-of-court statements; (3) the trial court failed to
weigh Petitioner's history of substance abuse as a mitigator; (4)

---

upbringing saddled him with emotional handicaps; (6) outside
influences and pressures saddled Petitioner with emotional
handicaps; (7) Petitioner was suffering great situational stresses
leading up to the time of the homicide; (8) Petitioner was
suffering emotional turmoil before and at the time of the homicide;
(9) Petitioner's anger and hostility stem from circumstances which
were beyond his control; (10) Petitioner was abused by his parents
including physical, mental and sexual abuse; (11) Petitioner has
no prior criminal convictions for violent felonies; (12) the
homicide was committed for emotional reasons; (13) there was a
conditional guilty plea subject to a life sentence which was
refused by the State; (14) Petitioner had potential for
rehabilitation in prison; and (15) the death penalty as applied to
Petitioner would be out of proportion with others who were allowed
to live. The statutory mitigator was given great weight. The first
nonstatutory mitigator was given substantial weight, and the
remaining nonstatutory mitigators were given from moderate to
little weight. The trial court concluded that Nelson failed to
establish the following statutory mitigators: (1) that he acted
under the effect of extreme emotional disturbance; (2) that he was
an accomplice with minor participation; (3) that he acted under
the domination of another person; and (4) that his capacity to
appreciate the criminality of his conduct was impaired. The trial
court followed the jury's recommendation and imposed the death
penalty for the first-degree murder conviction (Ex. A12 at 1083-
1106).

the trial court improperly found the cold, calculated and premeditated aggravating circumstance; (5) the trial court improperly found the especially heinous, atrocious or cruel aggravating circumstance; (6) the trial court gave the jury a vague instruction on the especially heinous, atrocious or cruel aggravating circumstance; and (7) the death sentence is disproportionate. Id. The Florida Supreme Court affirmed Petitioner's convictions and sentences; Nelson v. State, 748 So. 2d 237 (Fla. 1999) (hereinafter, Nelson I).

On January 5, 2001, Petitioner filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure ("Rule 3.850 motion"). Petitioner filed an amended Rule 3.850 motion on June 15, 2009, raising nine claims (Ex. C9 at 777-837).[6] In the motion, Petitioner alleged that: (1) trial counsel was ineffective for failing to ensure that Petitioner was tried by a fair and impartial jury; (2) trial counsel failed to present mitigating evidence of Petitioner's drug and substance abuse and mental health problems during the penalty phase; (3) trial counsel failed to raise the nature and extent of the neglect and abuse, especially sexual abuse, Petitioner suffered as a child;

---

[6] Petitioner filed his motion before the Florida Supreme Court created Rule 3.851 of the Florida Rules of Criminal Procedure, the post-conviction rule currently applicable to death-sentenced petitioners. Therefore, Rule 3.850 governs the motion. See Nelson II, 73 So.3d at 84, n.1.

(4) counsel failed to provide Petitioner's mental health expert with the information necessary to diagnose ADHD; (5) counsel failed to object and move for a mistrial when the State impermissibly appealed to the sympathy of the jury during closing argument; (6) trial counsel failed to ask the trial court to sequester the jury or admonish the jurors not to avoid media coverage of Petitioner's case between the guilt and penalty phases; (7) counsel failed to ensure that the trial court properly swore the jurors; (8) the cumulative effects of counsel's acts and omissions constituted ineffective assistance of counsel; and (9) co-defendant Joshua Brennan was more emotionally mature than Petitioner, yet received a life sentence because he was a juvenile at the time of the crime (Ex. C9 at 777-837).  The post-conviction court ordered an evidentiary hearing on each of the claims except for Petitioner's assertion that trial counsel had not ensured that he was tried by a fair and impartial jury and the claim regarding Brennan's life sentence. Id. at 897-98.  After the evidentiary hearing, the post-conviction court denied relief on all of the claims (Ex. C11 at 1111-31).  The Florida Supreme Court affirmed (Ex. C16); Nelson v. State, 73 So.3d 77, 83-84 (Fla. 2011) (hereinafter, Nelson II).

III.   <u>Governing Legal Principles</u>

   A.   *Standard of Review Under the Antiterrorism Effective Death Penalty Act ("AEDPA")*

Pursuant to the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and difficult to meet.  <u>White v. Woodall</u>, 134 S. Ct. 1697, 1702 (2014).  A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits which warrants deference.  <u>Ferguson v. Culliver</u>, 527 F.3d 1144, 1146 (11th Cir. 2008).

"Clearly established federal law" consists of the governing legal principles, rather than the dicta, set forth in the decisions of the United States Supreme Court at the time the state court issues its decision.  <u>White</u>, 134 S. Ct. at 1702; <u>Carey v. Musladin</u>, 549 U.S. 70, 74 (2006) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000)).  A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that

9

contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. <u>Ward v. Hall</u>, 592 F.3d 1144, 1155 (11th Cir. 2010); <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, <u>Brown v. Payton</u>, 544 U.S. 133, 134 (2005); <u>Bottoson v. Moore</u>, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Bottoson</u>, 234 F.3d at 531 (quoting <u>Williams</u>, 529 U.S. at 406). The unreasonable application inquiry "requires the state court decision to be more than incorrect or erroneous," rather, it must be "objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-77 (2003) (citation omitted); <u>Mitchell</u>, 540 U.S. at 17-18; <u>Ward</u>, 592 F.3d at 1155. Petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

White, 134 S. Ct. at 1702 (quoting Harrington v. Richter, 562 U.S. ----, 131 S. Ct. 770, 786-787 (2011)).

Finally, the Supreme Court has stated that "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (dictum). When reviewing a claim under § 2254(d), a federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see, e.g., Burt v. Titlow, 134 S. Ct. 10, 15-16 (2013); Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

**B.  *Standard for Ineffective Assistance of Counsel***

In Strickland v. Washington, the Supreme Court established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance. 466 U.S. 668, 687-88 (1984). A petitioner must establish that counsel's performance was deficient and fell

below an objective standard of reasonableness and that the deficient performance prejudiced the defense. Id.   This is a "doubly deferential" standard of review that gives both the state court and the petitioner's attorney the benefit of the doubt. Burt, 134 S. Ct. at 13 (citing Cullen v. Pinholster, 563 U.S. ___, 131 S. Ct. 1388, 1403 (2011)).

The focus of inquiry under Strickland's performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688-89.   In reviewing counsel's performance, a court must adhere to a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.   Indeed, the petitioner bears the heavy burden to "prove, by a preponderance of the evidence, that counsel's performance was unreasonable[.]"   Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006).   A court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct," applying a "highly deferential" level of judicial scrutiny. Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690).

As to the prejudice prong of the Strickland standard, Petitioner's burden to demonstrate prejudice is high. Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).   Prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is

12

reliable." Strickland, 466 U.S. at 687.  That is, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. At 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

### C.   *Exhaustion and Procedural Default*

The AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of available relief under state law. Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> > (A) the applicant has exhausted the remedies available in the courts of the State; or
> >
> > (B)
> >    (i) there is an absence of available State corrective process; or
> >
> >    (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1) (2012).

Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]" Duncan v. Henry,

513 U.S. 364, 365 (1995) (citing Picard v. Conner, 404 U.S. 270, 275-76 (1971)). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. Snowden v. Singletary, 135 F.3d 732 (11th Cir. 1998). In addition, a federal habeas court is precluded from considering claims that are not exhausted but would clearly be barred if returned to state court. Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991) (if a petitioner has failed to exhaust state remedies and the state court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims). Finally, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. Coleman, 501 U.S. at 750. If a petitioner attempts to raise a claim in a manner not permitted by state procedural rules, he is barred from pursuing the same claim in federal court. Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

Procedural default will be excused only in two narrow circumstances. First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both "cause" for the

default and actual "prejudice" resulting from the default. "To establish cause for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999)(internal quotation marks omitted). To establish prejudice, a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. Henderson v. Campbell, 353 F.3d 880, 892 (11th Cir. 2003).

The second exception, known as the fundamental miscarriage of justice, only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" Murray v. Carrier, 477 U.S. 478, 479-80 (1986). Actual innocence means factual innocence, not legal insufficiency. Bousley v. United States, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. Schlup v. Delo, 513 U.S. 298, 327 (1995). In addition, "[t]o be credible, a claim of actual innocence must be based on [new] reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324).

15

IV.  **Analysis**

  *A.    Claim One*

Petitioner asserts that his Sixth Amendment right to confrontation was violated by the erroneous admission of out-of-court statements made by his co-defendant, Keith Brennan ("Brennan") (Doc. 36 at 67).  Specifically, Petitioner asserts that because Brennan did not testify at Petitioner's trial, "the admissions of his out-of-court statements, through the testimony of the Porth sisters, violated [his] constitutional right to confront and cross-examine witnesses against him, as guaranteed by the Confrontation Clause of the Sixth Amendment, as applied to the States through the Fourteenth Amendment. See Cruz v. New York, 481 U.S. 186, 189 (1987); Pointer v. Texas, 380 U.S. 400 (1965)." Id. at 74.

  **(1)    Trial Testimony:**

At issue are portions of the testimony of witnesses Misty and Tina Porth.  At Petitioner's trial, Misty Porth (Misty) testified that at the time of Tommy Owens's ("Owens'") murder, she was seventeen years old and lived in Cape Coral, Florida (T. at 453-54).  She had an intermittent romantic relationship with Petitioner. Id. at 455.  Her sister, Tina Porth, had an intermittent romantic relationship with Brennan. Id. at 458. Around the time of Owens' murder, Misty and Tina were not getting along with their parents, and they decided to leave the area with

16

Petitioner and Brennan. Id.  The evening of the murder, Misty and Tina met with Petitioner, Brennan, and Owens. Id. at 462. Petitioner and Brennan told the girls to meet them later if they still wanted to leave. Id.  Later that evening, Petitioner and Brennan picked up the girls in Owens' car.  Misty asked where Owens was, but neither Petitioner nor Brennan responded.  Later when asked again, they said, "just imagine." Id. at 466-67.  The next day, the four stopped at a motel. Id. at 468.  Misty asked again what had happened to Owens, and Brennan told her that after Petitioner beat Owens with a bat, they tied his hands, slit his throat, and left his body behind Mariner High School. Id. at 469-70.  Petitioner and Brennan instructed the girls to clean the blood from their (Petitioner's and Brennan's) shoes. Id. at 471.  The four eventually left for New Jersey, where the girls called their grandmother who arranged for their uncle to pick them up. Id. at 474.  As they were leaving, Petitioner and Brennan told the girls that "nobody else was to know" what happened. Id.  Brennan told the girls that if anything happened, "he had brothers." Id. at 475.

Tina Porth ("Tina") testified that she had an intermittent romantic relationship with Brennan (T. at 489).  On the evening of the incident, Petitioner and Brennan told Tina that they wanted to get a car to leave town that night. Id. at 493-94.  Her sister called Petitioner on Owens' telephone to ensure that they would

17

pick them up. Id. at 497.  Petitioner and Brennan picked the girls up in Owens' car. Id. at 498.  After thinking about it for a little while, Tina became concerned as to why they were in Owens' car. Id. at 500.  Misty asked what had happened to Owens, and Petitioner told Brennan to answer.  He told the girls that they had killed him. Id.  When they stopped at a hotel, Petitioner and Brennan told the girls that they had asked Owens to drive them to a back road to meet somebody who owed money to Brennan.  When they arrived, Petitioner and Brennan got out of the car to smoke, but Owens stayed inside. Id. at 502.  Petitioner or Brennan put a scratch on Owens' car to ensure that he would get out to look at the scratch. Id.  When Owens exited the car, Petitioner hit him with a bat.  Owens began running and told Petitioner and Brennan to take the car, but Petitioner chased him and beat him unconscious and told Brennan to slit Owens' throat, which he did. Id. at 502-03.  Petitioner told the girls that Brennan had not helped with the murder as much as he had expected. Id. at 503-04.  Before they left the hotel, Petitioner and Brennan told the girls to wash the blood from their shoes. Id. at 505.  Petitioner and Brennan joked about stealing cars. Id. at 508.  After the girls told Petitioner and Brennan that they were going to leave, they were told that if they said anything, Brennon had brothers that could find them. Id. at 510.  Tina believed the statement to be a threat. Id.

(2)    **Florida Supreme Court Decision:**

When Petitioner raised this claim on direct appeal, the Florida Supreme Court concluded that Petitioner's silence in the face of Brennan's statements regarding Petitioner's involvement in Owens' murder amounted to Petitioner's adoptive admission of Brennan's statements. Nelson v. State, 748 So. 2d 237 (Fla. 1999); Fla. R. Evid. § 90.803(18)(b)(excepting from the hearsay rule a statement which is offered against a party and is "[a] statement of which the party has manifested an adoption or belief in its truth."). The Florida Supreme Court determined that the Fifth District Court of Appeal had established the proper criteria for admissions by silence in Privett v. State, 417 So. 2d 805 (Fla. 5th DCA 1982). Id. at 242. The Privett factors include a determination of whether: the statement was heard by the party claimed to have acquiesced; the statement was understood by the defendant; the subject matter was within the knowledge of the defendant; there were physical or emotional impediments to the person responding; the personal make-up of the speaker or his relationship to the party made it reasonable to expect a denial; and the statement itself would, if untrue, call for a denial under the circumstances. See Nelson, 748 So. 2d at 242 (quoting Privett v. State, 417 So. 2d 805, 806 (Fla. 5th DCA 1982)).

Applying these factors, the Florida Supreme Court concluded:

> The testimony of the Porth sisters established
> that Brennan's statements regarding the facts
> of Owens' murder were heard and understood by
> Nelson, as all four were in the car and the
> hotel room — the two places where the
> discussions occurred. Nelson has not raised
> any claim of impediment, either physical or
> emotional. Finally, Brennan's statements
> regarding Nelson's involvement in Owens'
> murder were such that if untrue they would
> call for a denial.
>
> We conclude that Nelson's silence in the face
> of Brennan's statements regarding Nelson's
> involvement in Owens' murder did amount to an
> admission by the acquiescence of Nelson in
> Brennan's statements. See Farina v. State, 679
> So.2d 1151, 1157 (Fla. 1996) ("Anthony could
> have taken issue with Jeffery's statements at
> any point, but instead either tacitly agreed
> with Jeffery's statements or actively
> discussed the details of the crime."), receded
> from on other grounds by Franqui v. State, 699
> So.2d 1312, 1320 (Fla. 1997). A reasonable
> person would have denied the statements under
> the circumstances. Hence, the Porth sisters'
> testimony regarding Brennan's statements was
> admissible in this case as an admission by
> silence on Nelson's part. Because there was an
> admission by Nelson, there can be no
> Confrontation Clause violation. Therefore, we
> find no merit to this issue.

Nelson, 748 So. 2d at 242.

### (3)    § 2254 Claim and Resolution

Petitioner asserts that the state court unreasonably applied

Cruz v. New York, 481 U.S. 186, 189 (1987); Pointer v Texas, 380

U.S. 400 (1965); Douglas v. Alabama, 380 U.S. 415 (1965); and Lilly

v. Virginia, 527 U.S. 116 (1999) in adjudicating this claim.

Specifically, Petitioner argues that the Florida Supreme Court did

20

not properly analyze this claim because it "did not engage in the appropriate constitutional analysis attendant to a Sixth Amendment Confrontation Clause violation; rather it examined the issue as if it were a mere state court evidentiary issue." (Doc. 36 at 74; Doc. 56 at 5). Petitioner further asserts that the Florida Supreme Court unreasonably applied Ohio v. Roberts, 448 U.S. 56, 66 (1980) to the attendant facts because it showed neither that the "adoptive admissions" exception to the hearsay rule was firmly rooted, or inherently reliable (Doc. 36 at 77-79).

Respondent counters that the Florida Supreme Court correctly ruled that the disputed statements were properly admitted against Petitioner (Doc. 47 at 27).

A state court is not required to cite Supreme Court cases or to even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). Petitioner's complaint that the Florida Supreme Court resolved this claim only in terms of state evidentiary law is both incorrect and would not warrant habeas relief.[7]   The Florida Supreme Court specifically held there was

---

[7]Petitioner also appears to assert that the trial court erred under Florida law because it did not properly address the "Privett criteria" when the defense objected to the admission of Brennan's statements through the Porth sisters (Doc. 56 at 6).  To the extent that Petitioner now argues that the trial court committed errors of state law, such a claim is not cognizable in a habeas corpus petition. Estelle v. McGuire, 502 U.S. 62, 67 (1991)("[I]t is not

not a confrontation clause violation because the testimony constituted an admission (by silence) by petitioner Nelson. Nelson, 748 So. 2d at 242. The relevant inquiry for Confrontation Clause purposes is not whether the Florida Supreme Court correctly concluded under Florida law that Petitioner adopted Brennan's statements, but rather whether the Sixth Amendment Confrontation Clause was violated by the admission of the statements.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const., VI. See Crawford v. Washington, 541 U.S. 36, 38 (2004); Lilly v. Virginia, 527 U.S. 116, 123 (1999). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversarial proceeding before the trier of fact." Lilly, 527 U.S. at 123-24 (quoting Maryland v. Craig, 497 U.S. 836, 845 (1990)). When the prosecution seeks to introduce statements of a declarant who is unavailable at trial, the courts must decide whether the Confrontation Clause permits

---

the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

the state to deny the accused his usual right to force the declarant to submit to cross-examination. Lilly, 527 U.S. at 124.[8]

Under prevailing Supreme Court authority at the time of Petitioner's conviction, the Sixth Amendment Confrontation Clause did not preclude use of hearsay evidence against a criminal defendant if the declarant was unavailable at trial and the hearsay bore "adequate indicia of reliability." Ohio v. Roberts, 448 U.S. 56, 66 (1980). Under Roberts, a statement bears sufficient indicia of reliability if: "(1) the evidence falls within a firmly rooted hearsay exception, or (2) it contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statement's reliability." Lilly, 527 U.S. at 125; Roberts, 448 U.S at 66.[9]  Therefore, in order to

---

[8] It is not disputed that Brennan was unavailable to testify at Petitioner's trial.

[9] In Crawford, the Supreme Court rejected Roberts' "indicia of reliability" test with respect to testimonial statements - such as prior testimony and custodial interrogations - holding that the Confrontation Clause does not permit the introduction of such statements unless the declarant is both unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant. Crawford, 541 U.S. at 59. "Before Crawford, this Court took the view that the Confrontation Clause did not bar the admission of an out-of-court statement that fell within a firmly rooted exception to the hearsay rule, see Ohio v. Roberts, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), but in Crawford, the Court adopted a fundamentally new interpretation of the confrontation right, holding that '[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.'"  Williams v. Illinois, 132 S. Ct. 2221, 2232 (2012).   The holding in Crawford is not

show entitlement to habeas relief, Petitioner must demonstrate both that Brennen's statements did not fall within a firmly rooted hearsay exception and that the statements were inherently unreliable.

Preliminarily, there is no doubt that the use of Petitioner's own statements against him did not violate the Confrontation Clause. As the Supreme Court has recognized, voluntary admissions "are routinely offered into evidence against the maker of the statement and carry a distinguished heritage confirming their admissibility when so used." Lilly, 527 U.S. at 127. Petitioner does not argue to the contrary. Rather, Petitioner argues that Brennan's statements regarding Petitioner's actions should have been excluded, and that the Porth sisters could not always distinguish with "clarity or particularity" which statements were made by Brennan or Petitioner (Doc 36 at 68).

(a)     **Firmly Rooted Hearsay Exception**

A hearsay exception is "'firmly rooted' if, in light of longstanding judicial and legislative experience . . . it rests on such a solid foundation that admission of virtually any evidence within it comports with the substance of the constitutional

---

retroactive on habeas review. Whorton v. Bockting, 549 U.S. 406 (2007). Even under a Crawford analysis, however, there is no violation of the Confrontation Clause because the statements were not "testimonial" within the meaning of Crawford.

protection." Lilly, 527 U.S. at 126 (quoting Roberts, 448 U .S. at 66 (internal quotation marks and citations omitted)). A "firmly rooted hearsay exception" is a category of statements which over time has proven trustworthy and is widely accepted as such among various jurisdictions and which inherently carries "'special guarantees of credibility' essentially equivalent to, or greater than, those produced by the Constitution's preference for cross-examined trial testimony." Lilly, 527 U.S. at 126 (citations omitted).   Whether or not a statement falls within a firmly rooted exception for Confrontation Clause purposes is a question of federal law.  Lilly, 527 U.S. at 125.

Adoptive admissions are universally considered as falling within a hearsay exception, based on the rationale that by adopting another's statements, the defendant makes them his own.  For this reason, confrontation - namely, cross-examination - is considered to be neither necessary nor relevant.

Petitioner argues that this particular hearsay exception cannot be firmly rooted because it has only been discussed twice in thirty years by the Florida Supreme Court (Doc. 56 at 6).  The Florida Supreme Court's infrequent need to discuss this exception does not detract from its firmly rooted foundation.  The adoptive admission exception has been recognized in numerous other jurisdictions.  See, e.g., United States v. Carter, 760 F.2d 1568 (11th Cir. 1985) (statement by first defendant to witness in

presence of second and third defendants that they were involved in drug smuggling was admissible as an adoptive admission against second and third defendants); <u>United States v. Joshi</u>, 896 F.2d 1303, 1311 (11th Cir. 1990)(defendant's nod of head in response to statement); <u>United States v. Champion</u>, 813 F.2d 1154, 1172 (11sth Cir. 1987); <u>United States v. Kehoe</u>, 310 F.3d 579, 591 (8th Cir. 2002) ("[co-defendant's] statements to which [witness] testified are [defendant's] own because he had adopted them. He effectively was a witness against himself, thus [witness's] testimony did not violate [defendant's] rights under the Confrontation Clause."); <u>Neuman v. Rivers</u>, 125 F.3d 315, 320 (6th Cir. 1997)(no Confrontation Clause violation occurs where the circumstances show that the defendant manifested adoption of the incriminating statements); <u>United States v. Rollins</u>, 862 F.2d 1282, 1297 (7th Cir. 1988) (where "a party manifests an intent to adopt another person's statements as his or her own, the need to cross-examine the absent informant under oath is not present and the [C]onfrontation [C]lause is not violated"); <u>United States v. Tocco</u>, 135 F.3d 116, 129 (2d Cir. 1998) ("Absent circumstances that render it more probable that a person would not respond to an accusation against him than that he would, such person's silence or other ambiguous conduct is admissible as an adoptive admission[.]"); <u>Berrisford v. Wood</u>, 826 F.2d 747, 751 (8th Cir. 1987) (admission of testimony regarding conversation between

defendant and accomplice did not violate defendant's Sixth Amendment right to fair trial; the principles of the Confrontation Clause should not nullify the well-established exception to the hearsay rule for adoptive admissions). The Supreme Court has, at least inferentially, joined this chorus, as evident in the Federal Rules of Evidence, which consider such statements to be non-hearsay. See Fed. R. Evid. 801(d)(2)(B)(a statement offered against a party that is "a statement of which [the party] had manifested an adoption or belief in its truth" is not hearsay). In light of this authority, the Court concludes that adoptive admissions are a "firmly rooted" exception to the hearsay rule.

Additionally, a defendant's silence has frequently been found to constitute an adoptive admission of another's statement. United States v. Jinadu, 98 F.3d 239, 244 (6th Cir. 1996)(party may manifest an adoption of a statement through language, conduct, or silence); United States v. Grunsfeld, 558 F.2d 1231, 1237 (6th Cir. 1977) (defendant's silence when introduced to third party as his codefendant's "business partner" was an adoptive admission); United States v. Hoosier, 542 F.2d 687, 688 (6th Cir. 1976) (defendant's silence in face of girlfriend's statement to third party regarding "sacks of money" in their hotel room was an adoptive admission); United States v. Williams, 445 F.3d 724 (4th Cir. 2006)(silence can be, but was not in this case, adoption of another's statement).

**(b)   Reliability of Evidence**

The Roberts Court concluded that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted exception.   In other cases however, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." Id. at 66.   Thus, even if the adoptive admission hearsay exception was not firmly established, Brennan's statements would not violate the Confrontation Clause if inherently trustworthy.   "Particularized guarantees of trustworthiness" must be evident in the statement itself: the hearsay evidence "must possess indicia of reliability by virtue of its inherent trustworthiness, [and] not by reference to other evidence at trial." Lilly, 527 U.S. at 138 (quoting Idaho v. Wright, 497 U.S. 805, 822 (1990)).   Specifically, courts look to the circumstances in which the incriminating statement is made (i.e. in custody or in a private setting), to whom it is made (i.e. law enforcement as opposed to a friend or confidant), and the nature of the statement itself (i.e. whether the statement is inculpatory or shifts blame or responsibility to someone else) when evaluating its reliability for Confrontation Clause purposes. See Roberts, 448 U.S. 66.

The Florida Supreme Court examined the circumstances surrounding the statements made by Brennan concerning Owens' murder and concluded that Brennan's statements were heard and

28

understood by Petitioner; that Petitioner had raised no claim of physical or emotional impediment; and that the statements were the type that would have called for denial if untrue. Nelson I, 748 So. 2d at 242.  In other words, the Florida Supreme Court concluded that Petitioner's admissions were inherently trustworthy. Likewise, Petitioner does not dispute that he was present when the statements were made; that the statements were made in a private setting to someone who was not expected to report to law enforcement; that he heard and understood Brennan's incriminating remarks; and that he had the ability and opportunity to dispute them, but declined to do so.

The United States Supreme Court cases relied upon by Petitioner are not comparable.  Each of the cases cited by Petitioner dealt with a co-defendant's admission made during formal interrogation and not with adoptive admissions made to friends who were not expected to report the statements to law enforcement.  Accordingly, Petitioner has not shown that the Florida Supreme Court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Claim One is denied pursuant to 28 U.S.C. § 2254(d).

**B.    Claim Two**

Petitioner asserts that he was deprived of his constitutional right to a fundamentally fair trial because the trial court failed to properly determine the admissibility of certain testimony (Doc. 36 at 80).   Specifically, Petitioner argues that the Florida Supreme Court recognized that it was error to admit some of the testimony from the State's DNA expert and that the court's harmless error analysis failed to comport with the Constitution. Id.

On direct appeal, Petitioner raised a claim that the trial court had erred under Florida law "by failing to properly determine the admissibility of testimony by the State's DNA expert." (Ex. 21 at 43).   The Florida Supreme Court rejected the claim on the basis that although the trial court had erred when it admitted the testimony, any resulting error was harmless.   The state court noted that State DNA expert Darren Esposito ("Esposito") had testified that DNA taken from Owens' body matched that found on a box cutter, a pair of underwear, and Petitioner's sneakers. Nelson, 748 So. 2d at 240.   Esposito testified that the DNA match could be expected to occur in approximately 1 in 17,800 Caucasians. Id.   Esposito testified that to make this calculation he had used numbers from an FBI database that was generally accepted in the scientific community.   However, during Esposito's voir dire, defense counsel established that Esposito had not actually used the FBI database for one of the numbers used in his calculation; rather Esposito

30

had consulted his supervisor, who in turn had consulted a population geneticist who had suggested a different number. Id. It was the number provided by the population geneticist that Esposito had used to calculate the 1 in 17,800 statistic. Id.[10]

The Florida Supreme Court concluded that under Florida law, it had been error "to permit Esposito to testify regarding a calculation derived from a particular source without first establishing that the source was generally accepted in the scientific community." Nelson, 748 So. 2d at 241. The Florida Supreme Court noted that the parties were in dispute as to whether the burden of establishing prejudicial error was on the movant or the benefiting party. However, the court concluded, under either standard, the trial court error had not affected the verdict, and Petitioner had not demonstrated prejudicial error:

> We reach this conclusion for two reasons. First, had Esposito used the FBI database as opposed to the figure given by the population geneticist, the likelihood of anyone else in the general population having the same DNA match of Owens would have been zero. Thus, the figure suggested by the population geneticist was helpful to Nelson's case, not harmful, inasmuch as it did not exclude the possibility that the blood could have originated from someone other than Owens. Second, in light of the other evidence, namely Nelson's

---

[10] Esposito had been reluctant to use the frequency calculated by using the number in the FBI database because had he done so, the odds of a random person matching that type would have been zero (T. at 566). Esposito believed that figure to be "too individualizing." Id.

confession, we conclude that this was not
reversible error.

Nelson I, 748 So. 2d at 241-42.

Petitioner argues that "[t]he Florida Supreme Court's
determination that the error was harmless beyond a reasonable doubt
as to [his] convictions cannot be squared with a proper review of
Supreme Court precedent." (Doc. 36 at 87). Specifically,
Petitioner directs the Court to Chapman v. California, 386 U.S. 18
(1967) and argues that Florida has patterned its version of the
constitutional harmless error test on this case (Doc. 36 at 86).

Respondent asserts that Petitioner does not cite to any United
States Supreme Court case establishing that the DNA testimony
should have been excluded and that the State's failure to satisfy
the test for admissibility set forth in Frye v. United States, 293
F. 1013 (D.C. Cir. 1923) does not implicate "due process or any
other federal constitutional principle[.]" (Doc. 47 at 40).
Accordingly, argues Respondent, because no constitutional error
was committed, the harmless error analysis conducted by the Florida
Supreme Court cannot provide a basis for habeas relief (Doc. 47 at
39). This Court agrees.

Petitioner did not raise a claim of constitutional error on
direct appeal where he presented the factual basis for this claim
to the Florida Supreme Court. Rather, the crux of Petitioner's
argument on direct appeal was that the trial court erred under

Florida law because it failed to determine that Esposito's testimony was based on scientific principles that were sufficiently established to have gained general acceptance in the field (Ex. A21 at 47). Petitioner did not contend that the state court's evidentiary ruling deprived him of due process under the federal Constitution. Likewise, in its consideration of this claim, the Florida Supreme Court discussed only Florida evidentiary law and did not treat the claim as raising a constitutional issue. Nelson I, 748 So. 2d at 240-42.

In his reply, Petitioner clarifies that it is only the constitutionality of the Florida Supreme Court's harmless error analysis (during its consideration of his state law claim) that is "the gravamen of the claim presented to this Court[.]" (Doc. 56 at 7). To the extent Petitioner attempts to create a federal issue in the instant Petition by arguing that the Florida Supreme Court erroneously determined that any error from the violation of state evidentiary law was harmless, he misconceives the scope of habeas corpus review. Habeas corpus in the federal courts does not serve as an additional appeal from a state court conviction. Fay v. Noia, 372 U.S. 391 (1963); Quince v. Crosby, 360 F.3d 1259, 1261-62 (11th Cir. 2004) ("while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."). Rather, before this Court is required to examine the

validity of the Florida Supreme Court's harmless error analysis, it must first conclude that an underlying *constitutional* error actually occurred.   See, e.g., Chapman, 386 U.S. at 22-23 (developing a rule for "harmless-constitutional-error")(emphasis added); Brecht v. Abrahamson, 507 U.S. 619 (1993) (discussing application of Chapman for reviews of federal constitutional error).   In other words, to demonstrate entitlement to habeas relief, Petitioner must show that the admission of the DNA expert's testimony resulted in a violation of due process or some other constitutional right.   Petitioner does not make this argument.

Even if this Court were to assume that the alleged error of state law was sufficiently egregious to amount to a denial of due process, Petitioner's reliance on Chapman is misplaced. Traditionally, harmless error analyses of trial court error followed the "harmless beyond a reasonable doubt" standard set forth in Chapman v. California, 386 U.S. 18 (1967).   Under the Chapman standard, the state bears the burden of proving that a constitutional error was harmless.   Brecht v. Abrahamson, 507 U.S. 619, 630 (1993).   However, the standard in Chapman is not applicable to harmless error examinations undertaken in a federal habeas corpus proceeding. Bonner v. Holt, 26 F.3d 1081, 1083 (11th Cir. 1994).   In Brecht, the Supreme Court announced a "less onerous standard on habeas review of constitutional error." Under Brecht, the proper inquiry is "whether the error had substantial and

injurious effect or influence in determining the jury's verdict."
Id. at 637.   Under this standard, habeas petitioners may obtain
plenary review of their constitutional claims, but they are not
entitled to habeas relief based on trial error unless they can
establish that it resulted in actual prejudice.   Id.   Petitioner
asserts that Esposito's testimony "was harmful to the defense
because it provided a scientific basis to link [Petitioner] to
Owens' murder and served to corroborate [Petitioner's]
confessions.   Under these circumstances the error in admitting the
DNA evidence cannot be harmless under the proper standards." (Doc.
36 at 88).

Petitioner has not satisfied the standards set forth in
Brecht.   As noted by the Florida Supreme Court, had Esposito used
the FBI database instead of the figure provided by the population
geneticist to calculate his statistics, the likelihood that the
DNA on Petitioner's shoes, underwear, and box cutter came from a
Caucasian other than the victim would have been zero instead of 1
in 17,800.   Nelson I, 748 So. 2d at 241.   Accordingly, Esposito's
revised calculation was actually helpful to Petitioner.   Moreover,
DNA was not the only evidence linking Petitioner to the crime.   In
addition to the testimony of the Porth sisters, Petitioner
confessed to planning the murder with Brennan.   Petitioner stated
in his confession that Brennan told Owens that he was supposed to
meet a friend who owed him money.   Owens drove them to the location

of the murder and Brennan lured Owens from the car by telling him
that there was a scratch on the bumper.  Petitioner admits that
when Owens exited the car, he struck him with a bat and that Owens
began bleeding as a result.  Petitioner told police that after the
first blow, Owens began running, but Petitioner chased him and
beat him four or five more times with the bat and watched as
Brennan cut Owens with the box cutter, eventually slashing his
throat.  Petitioner admitted that he and Brennan dragged Owens'
body after the attack and that they wrapped the box cutter used to
slash his throat in a pair of underwear (T. at 643-64).  Given
Petitioner's confession in which he admitted that Owens was
bleeding as he and Brennan beat him, cut him, and dragged his body,
Esposito's testimony that Owens' DNA was found on Petitioner's
shoes, the box-cutter, and a pair of underwear was not the type of
testimony that could be said to have "substantial and injurious
effect or influence in determining the jury's verdict." Brecht,
507 U.S. at 637.

The Florida Supreme Court's determination that the admission
of Esposito's testimony amounted to harmless error was neither
contrary to Brecht, nor Chapman, and is denied pursuant to 28
U.S.C. § 2254(d).

### C.    Claim Three

Petitioner asserts that the Eighth Amendment was violated by
the trial court's failure to weigh the mitigating circumstance of

36

his longstanding substance abuse (Doc. 36 at 89). Specifically, Petitioner asserts that he was a heavy user of drugs and alcohol and had spent fifteen months in a drug and alcohol treatment center. Id. at 90. Petitioner asserts that his presentence investigation report stated that he had used marijuana, ruffinal, ecstasy, beer, malt liquor, and vodka on a regular basis and had experimented with huffing gasoline, cocaine, LSD and crack. Id. He had received counseling through HRS, SWFAS, and the Eckerd Youth Development Center. Id. Petitioner asserts that none of the evidence of his history of substance abuse was refuted by the record, but that the trial court did not find Petitioner's history of alcohol and drug abuse to be a mitigating circumstance in its sentencing order. Id.

Petitioner raised this issue on direct appeal, and the Florida Supreme Court noted that Petitioner had testified that he was not under the influence of alcohol or drugs on the night of the murder. Nelson I, 748 So. 2d at 243. The Court also determined that Petitioner had not identified his substance abuse as a mitigating factor when he presented the mitigators to the trial court. Id. at 243. Citing Consalvo v. State, 697 So. 2d 805, 818 (Fla. 1996) and Lucas v. State, 568 So. 2d 18 (Fla. 1990), the Florida Supreme Court noted:

> The defense must share the burden and identify
> for the court the specific nonstatutory
> mitigating circumstances it is attempting to

37

> establish. Unlike statutory mitigation that has been clearly defined by the legislature, nonstatutory mitigation may consist of any factor that could reasonably bear on the sentence. The parameters of nonstatutory mitigation are largely undefined. This is one of the reasons that we impose some burden on a party to identify the nonstatutory mitigation relied upon.

Id. at 243 (internal citations and quotations omitted). The Florida Supreme Court also noted that it was evident that the trial court was aware of Petitioner's history of substance abuse, and found no merit in this claim.

Petitioner argues that the Florida Supreme Court erred under Hitchcock v. Dugger, 481 U.S. 393, 394 (1987); Skipper v. South Carolina, 476 U.S. 1, 2 (1986), and Eddings v. Oklahoma, 455 U.S. 104 (1982). Specifically, he asserts that "there is nothing in the Supreme Court's Eighth Amendment jurisprudence that holds that the Eighth Amendment applies only where the defendant 'identifies' the nonstatutory mitigation that support[s] a sentence other than the death penalty and that a state court can choose not to comply with the Eighth Amendment if the defense fails to 'identify' a nonstatutory mitigating circumstance[.]" (Doc. 92 at 132). Respondent asserts that there is no United States Supreme Court law which requires a particular weight be given to evidence offered in support of mitigation, and therefore, the Florida Supreme Court correctly denied this claim (Doc. 47 at 48).

38

None of the cases cited by Petitioner support his argument on this point.  Hitchcock, Skipper, and Eddings each involved a trial court's affirmative preclusion or limitation on a jury's consideration of non-specified mitigating circumstances.  Unlike Hitchcock and other similar cases, the record before this Court demonstrates no such limitation in the evidence the jury was allowed to consider.  Nor does it suggest that Petitioner's history of substance abuse was not considered by either the jury or the trial court (P. at 921-23, 1093-94).

Petitioner testified about his drug use and treatment at trial (T. at 802-04), and evidence was presented at the penalty phase that Petitioner had been exposed to drugs and alcohol from a young age (P. at 780, 790, 810).  Petitioner does not allege that the prosecutor or the trial court made any statement or gave any instruction precluding the jury from considering Petitioner's history of substance abuse as a mitigating factor. Indeed, the trial court instructed the jury to consider certain mitigating factors, among others. Id. at 921.  Likewise, the trial court specifically noted Petitioner's history of drug abuse in its sentencing order (Ex. A12 at 1092)(noting that Petitioner's mental health expert had testified to Petitioner's history of mental illness and alcohol and drug abuse).

None of the cases cited by Petitioner, singularly or collectively, amount to clearly established federal law

39

supporting a proposition that the Eighth Amendment precludes a state from requiring a defendant to identify nonstatutory mitigation. Accordingly, no grounds exist for granting habeas relief on this claim under 28 U.S.C. § 2254(d)(1) or § 2254(d)(2). See Sims v. Singletary, 155 F.3d 1297, 1315 (11th Cir. 1998) (no Hitchcock error when a jury instruction did not preclude a jury from considering all the evidence presented).

### D. Claim Four

Petitioner contends that the trial court erred in finding that there was sufficient evidence to support the cold, calculated, and premeditated ("CCP") aggravating factor (Doc. 36 at 94). Specifically, Petitioner asserts that the CCP aggravating circumstance was unsupported by the evidence because Petitioner's emotional suffering, sexual abuse by his stepfather, abandonment by his mother, and the rape of Tina Porth "more than provided a *pretense* of justification [which] rebutted the otherwise cold and calculated nature of the offense[.]" (Doc. 36 at 100). Petitioner also asserts that he did not carefully plan to murder Owens (Doc. 36 at 101).

Petitioner raised this claim on direct appeal, and the Florida Supreme Court adjudicated the claim as follows:

> The law is settled that in order to find CCP, it must be established that (1) the murder was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage, (2) the defendant had a careful plan or

prearranged design to commit murder before the killing, (3) the defendant exhibited heightened premeditation, and (4) the defendant had no pretense of legal or moral justification. See Jackson v. State, 648 So. 2d 85, 89 (Fla. 1994). In the present case, the trial court made the following findings in the sentencing order regarding CCP:

> The Defendant in this case made a plan in advance and lured the victim to the scene of his murder. The Defendant testified live and by video-taped confession that he calmly discussed with his Co-Defendant methods by which they might entice the victim out of his car so they could kill him.

> The Defendant hit the victim, then chased him down and continued the beating. The Defendant then stopped and discussed with the Co-Defendant the victim's offer to give them what they wanted and make up a story in return for his life. Both decided the victim must die. The victim was cut at the throat with a box cutter, bound, and dragged into the brush where he was beaten some more and finally left to die.

> These actions were the product of calm and cool reflection and were not prompted by emotional frenzy, panic or a fit of rage.

> The death of Tommy Owens was the result of a careful plan made well in advance of the commission of the offense thus indicating a heightened state of premeditation.

> Since these facts were all admitted by the Defendant and the evidence fully supports his admission, the aggravating factor that the capital felony for which the Defendant is to be sentenced was committed in a cold and calculated and premeditated manner without any pretense

of moral or legal justification has been
proved beyond a reasonable doubt.

First, Nelson argues that the calculation element
of Jackson was not proved beyond a reasonable doubt
because Nelson did not carefully plan to murder
Owens. We disagree. In his taped confession, Nelson
stated that he and Brennan discussed a scheme to
kill Owens and take his car, both the day before
the murder and the day of the murder. When Nelson
took the stand to testify, he admitted that he and
Brennan talked about killing Owens prior to the
murder. Based on this evidence, we find that the
calculated plan element exists beyond any
reasonable doubt.

Further, we reject Nelson's claim that he committed
this murder with a pretense of legal or moral
justification. A pretense of legal or moral
justification is "any colorable claim based at
least partly on uncontroverted and believable
factual evidence or testimony that, but for its
incompleteness, would constitute an excuse,
justification, or defense as to the homicide."
Walls v. State, 641 So. 2d 381, 388 (Fla. 1994)
(footnote omitted). In the case at bar, there were
allegations that Owens forced Tina Porth to engage
in oral sex with him, and that Nelson was aware of
these allegations. There was also evidence that
Nelson's stepfather sexually abused Nelson, and
that on the day of the murder, Nelson was told to
leave home by his mother after he resisted sexual
advances by his stepfather. Viewing this evidence
in the light most favorable to Nelson, it still
would not constitute an excuse, justification, or
defense to the homicide. See Hill v. State, 688 So.
2d 901, 907 (Fla.), cert. denied, 522 U.S. 907, 118
S. Ct. 265, 139 L.Ed.2d 191 (1997) ("In this case,
the trial judge properly rejected the proposition
that by killing persons in order to prevent them
from performing legal abortions, Hill acted under
a pretense of moral justification."); Dougan v.
State, 595 So. 2d 1, 6 (Fla.1992) ("One of [the
rules by which every civilized society must live]
must be that no one may take the life of another
indiscriminately, regardless of what that person
may perceive as justification."). Hence, we

> conclude that the trial court correctly found that
> CCP was established in this case.

Nelson I, 748 So. 2d at 244-45.

Petitioner asserts that the state court's rejection of this claim was contrary to Sochor v. Florida, 504 U.S. 527, 532 (1992) because "[a]n aggravating circumstance is invalid for Eighth Amendment purposes if it is not supported by the evidence." (Doc. 36 at 97, citing Sochor, 504 U.S. at 539). Respondent argues that Petitioner's reliance on Sochor is misplaced because it does not provide established federal law as to the sufficiency of the evidence necessary to support an aggravating factor (Doc. 47 at 54-55). This Court agrees with Respondent.

The United States Supreme Court has concluded that "in determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth Amendment violation, we think the more appropriate standard of review is the 'rational factfinder' standard established in Jackson v. Virginia[.]" Lewis v. Jeffers, 497 U.S. 764, 781 (1990). In Jackson, the Supreme Court held that where a federal habeas corpus claimant alleges that his state conviction is unsupported by the evidence, federal courts must determine "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

43

essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979). Petitioner has not satisfied this standard.

The Florida Supreme Court has determined that the CCP aggravating factor can be shown by "advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course." Swafford v. State, 533 So. 2d 270, 277 (Fla. 1988). In addition, the CCP aggravator can be supported by evidence of actions of the offender preceding the actual killing including transportation of the victim away from possible sources of assistance and detection. Id. The Florida Supreme Court has also found the heightened premeditation requirement of the CCP aggravator "where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder." Walker v. State, 957 So. 2d 560, 582 (Fla. 2007)(quoting Alston v. State, 723 So. 2d 148, 162 (Fla. 1998)).

Upon review of the evidence, including Petitioner's taped confession, the Court concludes that sufficient evidence was presented to support the finding of the CCP aggravator. There was an arranged plan between Petitioner and Brennon to take Owens' car by luring him to a remote location where Petitioner would incapacitate Owens by beating him with the bat that they knew Owens kept in his car, and Brennan would "finish him" by slashing his throat with a box cutter (T. at 644-55). Evidence was presented

44

that after the attack began, Owens begged Petitioner and Brennan to take his car and he would make up a story, but Petitioner felt that if they did that, they would not be believed, so they continued with the murder. Id. at 502.

Petitioner also argues that the CCP aggravator did not apply because he was acting with a pretense of justification when he killed Owens.  This was so because his stepfather had previously abused him, his mother had told him to leave home when he rejected his stepfather's advances, and the victim had previously coerced Tina Porth to engage in oral sex (Doc. 36 at 94).  Petitioner relies on Florida precedent in support of his argument.  In Cannady v. State, 427 So. 2d 723 (Fla. 1983), the Florida Supreme Court found that Cannady had at least a pretense of moral or legal justification because during his confessions he repeatedly stated that he never intended to harm the victim, whom he shot only after the victim jumped at him, and there was no evidence to disprove these contentions.  Similarly, in Banda v. State, 536 So. 2d 221 (Fla. 1988), the Florida Supreme Court found a pretense of justification because the victim's violent nature and apparent ability to harm Banda caused a real fear in Banda that the victim would kill him.

Unlike the defendants in Cannady and Banda, there is no evidence that Owens posed any threat to Petitioner, real or perceived.  Petitioner's desire for revenge against his stepfather

45

and Owens and his anger at his mother does not rebut the otherwise cold and calculating nature of this homicide. See Cox v. State, 819 So. 2d 705, 721-22 (Fla. 2002) (killing someone because of a desire for revenge does not constitute a pretense of legal or moral justification); Eaglin v. State, 19 So. 3d 935 (Fla. 2009) (because Eaglin had not demonstrated that he acted in response to a threat from either of his victims, his claim of acting with a pretense of justification must fail); Williamson v. State, 511 So. 2d 289 (Fla. 1987)(no pretense of justification in a prison killing where the victim engaged in no threatening acts prior to his being attacked by surprise and repeatedly stabbed).

A rational trier of fact could have found sufficient evidence to support a finding of the CCP aggravating circumstance. Accordingly, the Florida Supreme Court's adjudication of this claim was not contrary to and did not involve an unreasonable application of Jackson or Sochor and was not based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Claim Four is denied pursuant to 28 U.S.C. § 2254(d).

### E.   *Claim Five*

Petitioner asserts that the heinous, atrocious, or cruel ("HAC") aggravating circumstance did not apply because he intended to knock Owens unconscious before Brennan began stabbing him with the box cutter to avoid the infliction of pain and conscious

46

suffering (Doc. 36 at 102).  Petitioner argues that "[i]n the absence of proof beyond a reasonable doubt that Petitioner intended to inflict unnecessary and prolonged suffering, the trial court erred by finding the HAC factor[.]"  Id. at 106.

The Florida Supreme Court denied this claim as without merit:

> In issue five, Nelson asserts that the trial court erred in finding HAC. We disagree. In order for HAC to apply, the crime must be both conscienceless or pitiless and unnecessarily torturous to the victim. See Zakrzewski v. State, 717 So. 2d 488 (Fla. 1998); Hartley v. State, 686 So. 2d 1316, 1323 (Fla. 1996), cert. denied, 522 U.S. 825, 118 S. Ct. 86, 139 L.Ed.2d 43 (1997); Richardson v. State, 604 So.2d 1107, 1109 (Fla. 1992). The trial court made the following findings in the sentencing order:

>> When the victim got out to look, the Defendant hit the victim with the metal baseball bat. The facts show that the Defendant hit the victim twice before the victim tried to run away. The Defendant then chased the victim down and struck him again. While on the ground the victim asked the Defendant not to hit him anymore and told him to take the car and anything else he wanted. The Defendant repeatedly told the victim to "shut up." The victim then offered to make up a story and let the Defendant and the Co-Defendant take everything in return for his life. The Defendant then beat the victim again to knock him unconscious so that the Co-Defendant could slit the victim's throat. As the Co-Defendant began to cut the victim's throat, the victim cried out that he was not out yet whereupon the Defendant hit the victim again with the bat. After the victim's throat was cut, the evidence shows that he was still alive and the Defendant then hit the victim at least four more times. This ordeal lasted over an undetermined period of time where the victim suffered multiple blows to the head. The evidence shows that he was conscious and was

> aware of his impending doom when he asked to
> be knocked out before his throat was to be
> cut.
>
> Based on these facts, which were admitted by Nelson
> and supported by the record, the trial court did
> not err in finding Owens' murder to be heinous,
> atrocious, or cruel. See Zakrzewski; Hannon v.
> State, 638 So. 2d 39, 43 (Fla. 1994).

Nelson, 748 So. 2d at 245.

Petitioner submits that the Florida Supreme Court's decision in this case is contrary to Sochor v. Florida because this aggravating circumstance is not supported by the evidence (Doc. 36 at 104). Respondent asserts that the Florida Supreme Court's ruling was reasonable, and, as in Claim Four, the "appropriate precedent to apply is Jackson rather than Sochor" for claims that aggravating factors are not supported by the evidence (Doc. 47 at 51). This Court agrees with Respondent that the United States Supreme Court has concluded that the "rational trier of fact" standard, not Sochor, governs a determination of whether a state court erroneously found an aggravating circumstance. Lewis, 497 U.S. at 781.

Petitioner does not dispute the factual support for application of this factor; he merely asserts that he did not intend to inflict pain or suffering on the victim. This assertion does not state a claim. Under Florida law, the intention of the killer to inflict pain on the victim is not a necessary element of the especially heinous, atrocious, or cruel aggravating

48

circumstance. <u>See</u> <u>Guzman v. State</u>, 721 So. 2d 1155, 1160 (Fla. 1998) (there is no necessary intent element to the HAC aggravating circumstance); <u>Hoskins v. State</u>, 965 So. 2d 1, 15 (Fla. 2007) ("HAC does not have an intent element."); <u>Bowles v. State</u>, 804 So. 2d 1173, 1177 (Fla. 2001) (rejecting a claim that the trial court erred in refusing a proposed HAC instruction that included an intent element).

Because intent to cause the victim pain is not an element of the HAC aggravating factor, the Florida Supreme Court did not contradict any applicable law when it denied this claim. Moreover, a rational trier of fact could have found sufficient evidence to support a finding of the HAC aggravating circumstance. Evidence was presented at trial showing that after Petitioner struck Owens with a bat, Owens was pursued by Petitioner who struck him several more times, breaking his arm in the process. Owens begged Petitioner and Brennan to take his car and let him go. Owens was tied up and repeatedly cut by Brennan with the box cutter. Owens was conscious and aware of his impending doom during most of the attack. Florida case law fully supports the application of the HAC factor on the facts of this case. <u>See, e.g.</u>, <u>Randolph v. State</u>, 562 So. 2d 331, 338 (Fla. 1990) (affirming HAC where defendant repeatedly hit, kicked, strangled, and knifed victim who was conscious during various stages of the attack); <u>Francis v. State</u>, 808 So. 2d 110, 121, 134–35 (Fla. 2001) (approving HAC

aggravator where 66-year-old victim who was repeatedly stabbed had only one defensive wound); James v. State, 695 So. 2d 1229, 1235 (Fla. 1997)("[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.").

The Florida Supreme Court's adjudication of this claim was not contrary to and did not involve an unreasonable application of Jackson or Sochor and was not based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Claim Five is denied pursuant to 28 U.S.C. § 2254(d).

F.  **Claim Six**

Petitioner asserts that the jury received an unconstitutionally vague jury instruction on the HAC aggravating circumstance (Doc. 36 at 107). Specifically, he argues that "[t]he first sentence of the instruction given to the jury merely recites the statutory language 'especially heinous, atrocious, or cruel' from the statute itself. In the absence of a sufficient limiting construction, the statutory language is unconstitutionally vague and overbroad and thus violative of the Eighth Amendment." Id. at 109. Petitioner cites Espinoza v. Florida, 505 U.S. 1079 (1992), Maynard v. Cartwright, 486 U.S. 356 (1988), and Shell v. Mississippi, 498 U.S. 1 (1990) in support of this claim. Id. Respondent argues that Petitioner has not shown entitlement to

50

relief because "the jury was given an expanded instruction that was adopted specifically to cure the deficiency vagueness problem identified in Maynard." (Doc. 47 at 64).  This Court agrees that the instruction given in Petitioner's trial did not suffer from the same deficiencies as the instructions at issue in the cases relied upon by Petitioner.

Petitioner raised this claim on direct appeal where it was rejected by the Florida Supreme Court. Nelson, 748 So. 2d at 245-46.  The Florida Supreme Court noted that the jury was given the HAC instruction found on the Florida Standard Jury Instructions and that previous claims of the HAC's vagueness had been rejected. Id. (citing Hall v. State, 614 So. 2d 473, 478 (Fla. 1993); Preston v. State, 607 So. 2d 404, 410 (Fla. 1992)).

In 1973, the Florida Supreme Court limited the scope of the especially heinous, atrocious and cruel ("HAC") aggravator to "those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies - the conscienceless or pitiless crime which is unnecessarily torturous to the victim." State v. Dixon, 283 So. 2d 1, 9 (Fla. 1973). The addition of the last sentence of the instruction in Dixon served to cure the flaw found to be unconstitutional in Maynard v. Cartwright, 486 U.S. 356 (1988), Shell v. Mississippi, 498 U.S. 1 (1990), and Espinosa v. Florida, 505 U.S. 1079 (1992) — the cases relied upon by

Petitioner to support this claim.  As so construed and limited, the Florida HAC aggravator was specifically upheld against constitutional attack in <u>Proffitt v. Florida</u>, 428 U.S. 242, 255-256 (1976) ("We cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases.") (internal citation omitted).[11]

In this case, the trial judge gave the full <u>Dixon-Proffitt</u> jury instruction:

> Two, the crime for which the defendant is to be sentenced was especially heinous, atrocious or cruel.
>
> Heinous means extremely wicked or shockingly evil.
>
> Atrocious means outrageously wicked and vile.
>
> Cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering [of] others.
>
> The kind of crime intended to be included as heinous, atrocious or cruel is one accompanied by additional abilities that show that **the crime was conscienceless or pitiless and was unnecessarily torturous to the victim.**

---

[11] Notwithstanding the decisions in <u>Dixon</u> and <u>Proffitt</u>, Florida's standard jury instructions were not amended to incorporate the <u>Dixon</u> limitation on the HAC aggravator until 1990. <u>See</u> <u>In re Standard Jury Instructions Criminal Cases No. 90-1</u>, 579 So. 2d 75 (Fla. 1990).  As a result, in some capital cases tried in Florida before 1990 the jury instruction concerning the HAC aggravator consisted of nothing more than a reading of the statute itself without a definition of any of the included terms.  <u>See, e.g.</u>, <u>Espinosa v. Florida</u>, 505 U.S. 1079 (1992).

(P. at 919) (emphasis added).

The instruction given in this case, included the additional clarifying sentence approved in <u>Proffitt</u>, telling the jurors that "[t]he kind of crime intended to be included as heinous, atrocious or cruel is one accompanied by additional abilities that show that the crime was conscienceless or pitiless and was unnecessarily torturous to the victim." (P. at 919). Because the instruction to Petitioner's jury did not suffer the same defect as noted in the jury instruction cases he cites, the Florida Supreme Court did not rule contrary to established federal law when it rejected this claim.

Claim Six is without merit and is denied. 28 U.S.C. § 2254(d).

### G.   *Claim Seven(a)*

Petitioner asserts that counsel was ineffective for failing to ensure that he was tried and sentenced before a fair and impartial jury (Doc. 36 at 114). Specifically, Petitioner asserts that trial counsel failed to properly challenge for cause or utilize peremptory challenges to remove six allegedly pro-death penalty venire members, three of whom eventually served on the jury (Doc. 36 at 116-17). Petitioner also argues that counsel performed deficiently by permitting the State to excuse for cause prospective juror John Sankis who had expressed to the trial court that he was opposed to the death penalty (Doc. 36 at 119). These claims will be addressed separately.

### (1)  Counsel's  failure  to  remove  pro-death  penalty
venire members

Petitioner claims that potential jurors Torrone, Carlson, Dolan, McLaughlin, Hancock, Wotitzky, and Ligon told the trial court that they believed anyone convicted of premeditated first-degree murder should automatically be sentenced to death (Doc. 36 at 116).  Although defense counsel challenged these potential jurors for cause, he did not cite to Florida Statute § 913.03(10) to support the challenge and did not exercise a peremptory challenge to have these jurors removed from the panel. Id. at 117.[12]

Petitioner raised this claim in his Rule 3.850 motion where it was rejected by the trial court (Ex. C11 at 1113-18).  The Florida Supreme Court affirmed. Nelson II, 73 So.3d at 85-86.  The

---

[12] This statute states that a challenge for cause to an individual juror may be made if:

> The juror has a state of mind regarding the defendant, the case, the person alleged to have been injured by the offense charged, or the person on whose complaint the prosecution was instituted that will prevent the juror from acting with impartiality, but the formation of an opinion or impression regarding the guilt or innocence of the defendant shall not be a sufficient ground for challenge to a juror if he or she declares and the court determines that he or she can render an impartial verdict according to the evidence[.]

Fla. Stat. § 913.03(10) (1999).

Florida Supreme Court explained that even if, as in the instant case, trial counsel challenges a juror for cause due to perceived impartiality, the trial court need not excuse that juror if, after further questioning, the court establishes that "the juror is able to base his or her decision on the evidence presented and the trial court's instructions on the law." Nelson II, 77 So. 3d at 85.  The Florida Supreme Court concluded that counsel was not ineffective because "the purported pro-death penalty jurors under full interrogation attested to the trial court that they could recommend a sentence based on the evidence presented and the trial court's instructions on the law, and that they could weigh the aggravating and mitigating factors as they considered their recommended sentence." Id. at 85.

Respondent asserts that the state court's factual findings are supported by the record, "which reflects that [Petitioner's] jury was carefully selected and that no biased juror was seated." (Doc. 47 at 71).  Accordingly, argues Respondent, because Petitioner has demonstrated neither deficient performance nor resulting prejudice, this claim fails to satisfy either prong of Strickland. Id. at 72.  Indeed, Petitioner does not explain how the Florida Supreme Court's conclusion on this issue was contrary to, or an unreasonable application of, clearly established federal law.  A review of the record and applicable law supports the state court's conclusions.

55

When questioning the potential jurors, counsel asked whether
any of them were of the opinion "that everybody convicted of
premeditated murder should receive the death penalty?" (T. at 163).
Seven jurors raised their hands. Id. at 174.   Counsel requested
that each of the seven be struck for cause. Id.   The trial court
asked counsel for support for the request, and counsel argued that
his request had support in case law. Id. a 175.  The judge explained
the guilt and innocence phases of a death penalty trial to the
jurors and questioned them as to whether they would be able to
follow the law on this issue:

> And you understand that in the penalty phase, you
> will be given certain legal instructions, and parts
> of those instructions are that you will consider
> the evidence as it applies to mitigating
> circumstances and aggravating circumstances, and
> then you will weigh the mitigating circumstances
> and the aggravating circumstances and come up with
> a recommendation to the judge which does not have
> to be unanimous, but you have to give me a
> recommendation.  You may not all agree on that.
>
> Can all of you – my question is – follow the law
> that I give you on how to weigh the mitigating and
> aggravating circumstances when you make your
> recommendation to the judge, whatever it may be –
> and the law requires me to give that recommendation
> great weight.
>
> Let me ask it this way.  Is there anyone sitting on
> this panel, specifically those of you who said that
> all folks who are convicted of first degree
> premeditated murder should be put to death who
> cannot follow the law, will all of you, then, who
> I've just spoken to, follow the law and weigh the
> aggravating circumstances and the mitigating
> circumstances and come up with a recommendation and
> not automatically say since he's been convicted, he

> should be put to death?  All of you can weigh and
> follow the law in this case now that you understand
> what some of the rules might be?
>
> Let the record reflect they've all answered in the
> affirmative, they can follow the law and now that
> they understand it, we can proceed.

Id. at 175-77.  At that point, the trial court denied counsel's
motion for cause.  Id. at 177.  Counsel did not exercise a
peremptory challenge to remove any of the seven jurors from the
panel, and three served on the jury.

Under Florida law, jurors who initially express views
pertaining to the death penalty are permitted to serve if they
subsequently indicate an ability to abide by the trial court's
instructions.  See Johnson v. State, 660 So. 2d 637, 644 (Fla.
1995); Bryant v. State, 656 So. 2d 426, 428 (Fla. 1995).  Moreover,
Florida Statute § 913.03(10), the rule Petitioner now asserts
counsel should have cited in support of his objection, does not
support his claim.  Rather, the rule states that "the formation of
an opinion or impression regarding the guilt or innocence of the
defendant shall not be a sufficient ground for challenge to a juror
if he or she declares and the court determines that he or she can
render an impartial verdict according to the evidence[.]" Id.  In
this case, the trial court determined that the jurors could follow
the law.  Accordingly, counsel was not ineffective for failing to
cite to this statute in support of his motion to strike these
jurors for cause. See Brownlee v. Haley, 306 F.3d 1043, 1066 (11th

Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit).

Likewise, given that these jurors each indicated that he or she could weigh the aggravating circumstances and the mitigating circumstances and come up with a recommendation in accordance with the law, Petitioner has not presented sufficient evidence showing that counsel had any reason to exercise his peremptory challenges on these jurors.   Counsel actively participated in voir dire, indicating that any decisions to challenge, or not to challenge, jurors were made as a part of a reasonable trial strategy rather than as a result of counsel's failure to provide effect assistance. This conclusion is strengthened by the fact that counsel exercised peremptory challenges on other prospective jurors, showing that he was aware not only of his ability to make such a challenge, but also of the risk that potentially biased jurors could pose to Petitioner (T. at 178-80).   "Assessing jurors during voir dire also requires an evaluation of demeanor and credibility. Review of counsel's performance is highly deferential in any case, but the case for deference is even greater when counsel is evaluating credibility." Bell v. United States, 351 F. App'x 357, 360 (11th Cir. 2009); Gardner v. Ozmint, 511 F.3d 420, 426 (4th Cir. 2007)("On habeas review, federal courts generally accord particular deference to the judgment of trial counsel during voir dire.")(citation omitted); DeLozier v. Sirmons, 531 F.3d 1306,

1323 (10th Cir. 2008) ("an attorney's actions during voir dire are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness") (citation omitted).  Petitioner has failed to satisfy the first prong of the Strickland test on this issue.

Even assuming that Petitioner could show that counsel's decision not to strike any of these jurors was outside the range of professional competence, he has not demonstrated resulting prejudice.  To show prejudice from counsel's failure to use peremptory strikes, it is necessary to show that the veniremen did indeed harbor actual bias against Petitioner. See Rogers v. McMullen, 673 F.2d 1185, 1189 (11th Cir. 1982) (a defendant's Sixth Amendment right to a fair and impartial jury is not violated unless the defendant can show that a member of the jury which heard his case was biased); Davis v. Woodford, 384 F.3d 628, 643 (9th Cir. 2004)("Establishing Strickland prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased.").  As noted, each juror indicated that he or she could follow the law as it pertained to Petitioner's case.  Jurors are presumed to follow the court's instructions. See Raulerson v. Wainwright, 753 F.2d 869, 876 (11th Cir. 1985) ("Jurors are presumed to follow the law as they are

instructed."). Petitioner has not made a showing that any biased juror sat on his case.

This issue fails on both prongs of Strickland and is denied pursuant to 28 U.S.C. § 2254(d).

### (2) Counsel's failure to rehabilitate anti-death penalty juror

Petitioner argues that counsel performed deficiently by permitting the State to excuse prospective juror John Sankis, who had expressed general opposition to the death penalty (Doc. 36 at 119).

The Florida Supreme Court rejected this claim:

> Nelson also contends that trial counsel were ineffective because they failed to ensure that prospective juror Sankis served on the jury. The trial court excused prospective juror Sankis due to his clear and open adverse predisposition to the death penalty. This excusal was proper because juror Sankis was unable to place aside his personal aversion toward the death penalty and impartially recommend a sentence — even after trial counsel attempted to provide a reasonable justification for the imposition of the death penalty. See, e.g., Busby, 894 So. 2d at 96 ("The trial court must excuse a prospective juror for cause if 'any reasonable doubt' exists regarding his ability to render an impartial judgment and recommendation as to punishment."). Therefore, the trial court acted properly in excusing Sankis, and trial counsel were not ineffective in their attempts to retain him for the jury panel.

Nelson II, 73 So. 3d at 86.

Petitioner does not explain how the Florida Supreme Court's adjudication of this claim was unconstitutional. Rather, he argues that counsel was ineffective because the holding in Witherspoon v. Illinois, 391 U.S. 510 (1968) demands that jurors who oppose the death penalty be allowed an opportunity for rehabilitation. Id. Petitioner asserts that trial counsel had a "duty to effectively cite the correct law to the court in order to ensure that otherwise acceptable jurors are not improperly excluded." (Doc. 36 at 121). Respondent counters that the state court ruling is supported by the record and that the dismissal of juror Sankis could not have been avoided even had counsel performed differently because juror Sankis maintained that he could not vote for the death penalty under any circumstances (Doc. 47 at 71, 73-74). A review of the record and the applicable law supports a conclusion that counsel did not perform deficiently.

In Witherspoon, the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. Subsequently, in Wainwright v. Witt, the Court attempted to refine the standard and alleviate confusion in the lower courts. 469 U.S. 412 (1985). In revisiting the issue of what degree of deference a federal court in a habeas corpus

proceeding should pay a state court's excusal of prospective jurors for their views opposing capital punishment, the <u>Witt</u> Court held that the standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" <u>Id.</u> at 424 (quoting <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980)). The Court added that this standard does not require that the "juror's bias be proved with 'unmistakable clarity.'" <u>Id.</u> Noting that assessments of demeanor and credibility are "peculiarly within a trial judge's province," the Court also decided that the trial court's determination on this issue is a factual finding deserving deference on habeas review. <u>Id.</u> at 428-29. The Florida Supreme Court adopted the <u>Wainwright</u> reasoning in <u>Foster v. State</u>, 614 So. 2d 455 (Fla. 1992).

Contrary to Petitioner's assertions in the instant petition, after juror Sankis indicated during voir dire that there was no circumstance under which he would vote for the death penalty, counsel cited to <u>Witherspoon</u> and to <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985) for the proposition that Sankis was subject to rehabilitation (T. at 292). Next, counsel attempted to rehabilitate Sankis as a juror:

> COUNSEL. Mr. Sankis, I gather you don't feel that you would follow the law because you don't believe in the death penalty?

A.      Yes.

Q.      Wouldn't you agree with me that the
        death penalty cases require a cross
        segment of society on a jury?

A.      Yes.

Q.      And the ideal jury should have
        people that draw from both sides,
        those that favor and those that
        oppose the death penalty; would you
        agree with that?

A.      Yes.

                        . . .

Q.      And to have, for example, only
        people who are in favor of the death
        penalty would not be fair?

A.      I would not think so.

Q.      Now, given the way you feel about
        the balance jury composition,
        couldn't you put aside your own
        personal opposition to the death
        penalty and follow the law as
        instructed by Judge Nelson in order
        to give this defendant a fair trial?

A.      Exactly what do you mean by that?

Q       Well, I mean, could you sit and
        deliberate fairly?

A.      Yes.

Q.      And take those things into
        consideration, which the judge says
        you should take into consideration,
        and weigh them fairly?

A.      Yes.

Q.      Thank. You.  I have no further
        questions, Your Honor.

                        63

> COURT:     Okay.  Sir, with that in mind, is
>            there any circumstances in this case
>            in which you would ever vote for the
>            death penalty?
>
> A.         No.

Id. at 299-300.  Sankis unequivocally told the trial court that he

would not follow the law on the issue of the death penalty.   The

trial court, who was in the best position to judge this prospective

juror's demeanor, believed that Sankis was not competent to serve

as a juror because he stated in voir dire that he could not vote

in favor of death under any circumstance (Ex. C11 at 1117-19).

The trial court's conclusion was affirmed by the Florida Supreme

Court.  This determination is supported by the record, and entitled

to deference in this federal habeas proceeding. See Witt, 469 U.S.

at 428.

Petitioner's claim that counsel was deficient for failing to

rehabilitate Sankis does not warrant habeas relief. 28 U.S.C. §

2254(d).

### H.   Claim Seven(b)

Petitioner asserts that trial counsel was ineffective for

failing to ask the trial court to sequester the jurors or admonish

them not to listen to news reports about the case between the guilt

and penalty phases of his trial (Doc. 36 at 122).  Specifically,

Petitioner states that there was a long break between the guilt

and penalty phases of his trial.  During the break, Petitioner

engraved a tattoo on his arm that said "Natural Born Killer." Id.
Some of the jurors were exposed to news reports of Petitioner's
self-inflicted tattoo. Id. Petitioner also asserts that counsel
was ineffective for agreeing with the State to forego Petitioner's
penalty-phase testimony of remorse in exchange for the State's
agreement to forego presentation of the tattoo evidence.
Petitioner alleges that he suffered prejudice from counsel's
failures because "defense counsel allowed the prosecutor to
frighten them into agreeing not to introduce evidence of
Petitioner's sincere remorse regarding the homicide in exchange
for the prosecution's willingness not to introduce evidence of the
tattoo." Id. at 123.

After Petitioner raised this claim in his Rule 3.850 motion,
the trial court held an evidentiary hearing. During the hearing,
counsel explained that he had requested a six-week break between
the guilt and penalty phases of Petitioner's trial because he
needed to gather witnesses from Indiana, consult with his mental
health witness, and "some of the evidence in this case was just
really, really brutal and it was our opinion that it wouldn't hurt
us at all to allow a period of time to go be to kind of take some
of the sting off." (Ex. C10 at 1090; Ex. A8 at 589). Counsel
admitted that the trial judge did not admonish the jurors to avoid
media coverage of the trial during the break between the guilt and
penalty phases (Ex. C10 at 1090). Counsel stated that he had no

reason to think that anything newsworthy would happen during the break and agreed that the jury had already seen all the brutal evidence of the case. Id. at 1091.  Counsel was "blindsided" by Petitioner's decision to tattoo "natural born killer" on his arm before the penalty phase of the trial. Id. at 1093, 1102.

After learning of Petitioner's tattoo, counsel filed a motion in limine to preclude the prosecution from mentioning the tattoo and also moved for mistrial based on media publicity surrounding the case (Ex. A8 at 627-664).  A hearing was held on the motions on October 29, 1996. Id. at 627-64.  The trial court agreed to conduct a voir dire of the jury to see if any juror had seen or heard media coverage of the case during the break, and if so, if they formed any opinion regarding Petitioner's penalty as a result of the tattoo. Id. at 643.  Six jurors were questioned by the trial court regarding media reports to which they had been exposed.  All indicated that they could put aside anything they heard, follow the law, and render an impartial verdict (Ex. A10 at 742-52).

The Florida Supreme Court rejected the claim that counsel should have sought sequester or admonishment of the jurors. The court noted that "the mere existence of trial publicity does not automatically result in a presumption of partiality and unfairness of constitutional magnitude . . . Rather, jurors are presumed impartial if they establish that they can set aside all preconceived opinions, and render a verdict and recommend a

66

sentence based on the evidence presented in court." <u>Nelson II</u>, 73 So.3d at 86 (citing <u>Bolin v. State</u>, 736 So. 2d 1160, 1164 (Fla. 1999)).  The Florida Supreme Court determined that Petitioner had established neither deficient performance nor prejudice on this issue:

> In this case, during the evidentiary hearing, trial counsel admitted that, in hindsight, maybe he should have requested an instruction at the end of the guilt phase with regard to unexpected media coverage that pertained to Nelson's case. However, when viewed from the perspective of trial counsel at the end of the guilt phase, we hold that the performance of counsel was not deficient.  As related by trial counsel, at the end of the guilt phase, trial counsel had no idea that Nelson would personally engrave a negative tattoo on his body and that the media would print or televise news stories concerning the tattoo that jurors would encounter. Trial counsel did not learn of the tattoo or any news stories until the day before the penalty phase. It is incredible to expect that any attorney could reasonably foresee and prepare for such irrational conduct by a client who was just convicted of first-degree murder and facing a possible death sentence. Under the circumstances of this case, performance of trial counsel—when viewed from a perspective free of hindsight—was not deficient. <u>See Henry</u>, 948 So.2d at 620.
>
> Also, Nelson was not prejudiced by encounters with media coverage that concerned his tattoo as revealed during the subsequent actions of the trial court. As established during the evidentiary hearing, at the onset of the penalty phase, the trial court fully examined the possibility that some of the jurors may have been impacted by encounters with media coverage of Nelson's tattoo. However, when interrogated by the trial court, the jurors in

> question responded that they could remain
> impartial and follow the law despite the news
> stories. Some of the jurors in question stated
> that they barely comprehended the news stories
> and that the stories did not affect their
> perspective of the case. This action by the
> trial court established that the news stories
> did not affect the impartiality of the jurors,
> and established that there was no prejudice to
> Nelson caused by trial counsel's failure to
> request an instruction or sequestration.

Nelson II, 73 So. 2d at 86-87.

Respondent asserts that Petitioner does not explain how the state court's rejection of this claim was contrary to, or an unreasonable application of, Strickland or was based on an unreasonable determination of the facts (Doc. 47 at 79).  Indeed, Petitioner merely argues that counsel should have "enforced Petitioner's constitutional rights more fervently, requested further in-depth questioning of the jurors, and request[ed] the empaneling of a new jury for the penalty phase because the jury had been infected with improper outside influence." (Doc. 36 at 125).  This argument is unavailing.

The test for ineffectiveness is not whether counsel could have done more.  "To state the obvious: the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable.  But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (quoting Burger v. Kemp, 483 U.S. 776

68

(1987)).  Petitioner does not assert that counsel was aware that
he would tattoo "natural born killer" on his arm during the interim
between the guilt and penalty phases of his trial or that counsel
directed him to do so (Ex. C10 at 1061).  Rather, as was noted by
the Florida Supreme Court, Petitioner's decision to engrave a
negative message on his arm was irrational and counsel cannot have
expected this behavior from a defendant who had just been convicted
of murder. See Nelson II, 73 So. 3d at 87.  Accordingly, Petitioner
has not overcome the strong presumption that trial counsel's
performance was reasonable or established that no competent
counsel would have failed to request that the jury be sequestered
or instructed to forego media exposure during the interim between
guilt and penalty phases of Petitioner's trial. See Provenzano v.
Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) (recognizing that
counsel's conduct is unreasonable only if petitioner shows "that
no competent counsel would have made such a choice").

Petitioner's argument that he suffered prejudice from
counsel's failure is also unsupported by the record.  Each juror
that was exposed to media reports indicated that he or she could
put aside what they had heard or read and follow the law.
Accordingly, Petitioner's claim that counsel was ineffective for
failing to request sequestration of the jury or an instruction to
avoid media exposure fails on both prongs of Strickland.

Neither was counsel ineffective for agreeing to withhold Petitioner's penalty-phase testimony regarding remorse in exchange for the State's agreement to withhold evidence of Petitioner's self-inflicted tattoo. The Florida Supreme Court determined that counsel's decision to enter into the agreement was a reasonable strategic decision:

> As established during the evidentiary hearing, trial counsel entered into the agreement only after they weighed the possible prejudicial impact of evidence with regard to the tattoo against the value of the purported remorse testimony by Nelson. Trial counsel strategically decided to accept the agreement because Nelson had already stated his remorse during the guilt phase, and further testimony would have caused the jury to hear evidence with regard to Nelson's "natural born killer" tattoo, which directly negated Nelson's assertion of remorse. Trial counsel opined that evidence of the tattoo would have been extremely negative because, at the time of Nelson's trial, a violent movie entitled "Natural Born Killers" was extremely popular. Nelson also testified that he had a feeling of only "slight" remorse for his crime at the time of trial. Such a callous disposition, coupled with the especially negative evidence of Nelson's tattoo, led trial counsel to make a reasonable, strategic decision to enter into the agreement with the State.

Nelson II, 73 So.3d at 88.

Petitioner presents no argument or evidence to rebut the state court's conclusion that the decision to forego Petitioner's penalty-phase testimony regarding remorse was a reasonable strategic decision. Strategic choices made after a thorough

investigation are virtually unassailable. <u>See</u> <u>Strickland</u>, 466 U.S. at 690. The question of whether an attorney's actions were the result of a tactical or strategic decision is an issue of fact, and a state court's conclusion on that issue is presumptively correct. <u>Provenzano</u>, 148 F.3d at 1330. The Florida Supreme Court's conclusions are supported by the record.

Counsel testified at the evidentiary hearing that he believed the agreement to forego Petitioner's penalty-phase testimony was beneficial to Petitioner (Ex. C10 at 1094). Counsel said that "we thought that we had gotten most of [Petitioner's] testimony [regarding remorse] in during the guilt phase." <u>Id.</u> at 1093. Counsel did not think that the defense had "very poignant evidence of remorse," and Petitioner had already indicated his remorse to the jury. <u>Id.</u> at 1094. Indeed, at trial, Petitioner testified that he was "very sorry" for what had happened (T. at 811-12). However, at the evidentiary hearing on this claim, Petitioner asserted that he felt only "slight" remorse for killing Tommy Owens (Ex. C10 at 1053, 1060). At the evidentiary hearing, Petitioner could not identify anything he would have testified to differently at the penalty phase. <u>Id.</u> at 1058-59.[13]

_____

[13] Petitioner did argue at the evidentiary hearing that he "might" have said something different to the jury had he testified at the penalty phase, but when pressed, he could not identify what he would have told the jury (Ex. C10 at 1058-59).

Petitioner presents no argument or evidence to rebut the state court's factual finding that counsel's decision to forego Petitioner's penalty-phase testimony regarding remorse was a reasonable strategic decision. This claim fails under 28 U.S.C. § 2254(d) and (e)(1).

### I.   *Claim Seven(c)*

Petitioner asserts that counsel was ineffective because he failed to have Petitioner's mother and stepfather under a subpoena to ensure their availability as penalty phase witnesses (Doc. 47 at 88-89). Petitioner asserts that his mother, Peggy Percifield, would have testified about Petitioner's troubled background, Petitioner being forced to drink vodka at a young age, and physical and sexual abuse by Petitioner's stepfather, Gregory Percifield (Doc. 36 at 126). Petitioner claims that he suffered prejudice because "the opportunity was lost for the jury to hear the testimony of Petitioner's mother and of the stepfather's admission of the sexual abuse he wrought on the Petitioner during his young life." Id. at 127.

Petitioner raised this claim in his Rule 3.850 motion where it was denied by the trial court after an evidentiary hearing. The Florida Supreme Court affirmed. Nelson II, 73 So. 3d at 88-89. Citing Nelson v. State, 875 So. 2d 579, 583 (Fla. 2004),[14]

---

[14] This case involved a different defendant with the surname "Nelson".

the Florida Supreme Court noted that if a witness would not have
been available to testify, then a petitioner generally cannot
establish deficient performance or prejudice from counsel's
failure to call that witness at trial. Nelson II, 73 So.3d at 88.
Accordingly, concluded the court, counsel's performance was not
deficient because the Percifields absconded after counsel's guilt-
phase opening statement in which he expressed an intention to
present evidence of Gregory Percifield's physical and sexual abuse
of Petitioner. Nelson II, 73 So. 3d at 89.  The state court noted
that trial counsel had intended to present testimony from the
Percifields at the penalty phase, but by that time they had already
absconded without trial counsel's permission and were unavailable
to testify. "That unavailability negated any deficient performance
by counsel and Nelson has not established prejudice." Nelson II,
73 So.3d at 89.  The Florida Supreme Court also concluded that
Petitioner could not demonstrate prejudice because the proposed
testimony of Petitioner's childhood abuse was cumulative to other
evidence presented at trial:

> In addition, even if counsel were deficient in
> their failure to locate or subpoena the mother
> and stepfather, the testimony of those
> witnesses during the penalty phase would have
> been cumulative to other evidence presented.
> More specifically, during the guilt phase,
> Nelson himself testified as to his
> dysfunctional upbringing that included
> physical and sexual abuse by his stepfather,
> as well as his chronic use of drugs and
> alcohol. During the penalty phase, a mental

> health expert and other members of Nelson's
> family members presented the same evidence.
> Therefore, any additional testimony by the
> mother and stepfather with regard to the
> dysfunctional upbringing of Nelson would have
> been cumulative to other evidence presented.
> This negated Nelson's claim that trial counsel
> were ineffective for their failure to locate
> or subpoena the mother and stepfather, as
> Nelson was unable to establish how the failure
> to subpoena the mother and stepfather
> prejudiced him. See Darling, 966 So.2d at 377.

Nelson II, 73 So. 3d at 89.

Respondent argues that the record supports the state court's conclusions and that, although Petitioner makes a conclusory argument that Strickland was unreasonably applied, "he offers no analysis to support the argument." (Doc. 47 at 91-92). The Court agrees that Petitioner has not shown how the state court's adjudication of this claim was unreasonable.

At the evidentiary hearing on this claim, counsel testified that the Percifields fled after it was revealed in opening statement that part of the defense would be that Petitioner had suffered sexual abuse at the hands of Mr. Percifield (Ex. C10 at 1086). Counsel testified that he did not believe that a subpoena would have stopped the Percifields from leaving. Id. at 1098-99. Counsel used the addresses and phone numbers of the Percifields to try to locate them, but was unsuccessful. Id. at 1099–100. Counsel decided not to ask for an extension of time to search for the Percifields because he did not believe at that point that they

74

would testify favorably for Petitioner. Id. at 1099.  Counsel also testified that he was unaware of any evidence regarding Petitioner's substance abuse, dysfunctional upbringing, severe neglect, or sexual abuse that he was unable to bring to light through the testimony of other witnesses. Id. at 1086-88.

A review of the record supports the state court's conclusion that the Percifield's testimony would have been cumulative to evidence already before the jury.  At the penalty phase, Petitioner's defense team presented the testimony of psychologist Sidney Merin, Petitioner's mental health expert. Merin testified that Petitioner came from a markedly dysfunctional family and that his stepfather had sexually abused him.  He testified that on the day of the murder, Mr. Percifield had approached Petitioner for sex. He testified that Petitioner had used drugs and alcohol at a very young age (P. at 784-93).  Petitioner's father, James Nelson, testified that when Petitioner was a baby, he and Petitioner's mother would put alcohol in Petitioner's bottle when he had colic. Id. at 810.  Three of Petitioner's aunts testified as to the neglect and abuse Petitioner suffered at the hands of his mother. Id. at 816-17, 834, 845-48.  Two aunts also testified that Petitioner's mother begged them not to come to Florida to testify on Petitioner's behalf because it would bring up "dirty laundry" and could result in charges being brought against the Percifields.

Id. at 825, 832.   The aunts also testified that there was a history of mental illness in Petitioner's family. Id. at 823, 833.

At his trial, Petitioner testified about the abuse and neglect he suffered at the hands of his mother and stepfather (T. at 795-98).  He testified that Mr. Percifield beat him and sexually abused him.  Id. at 800-01.   He testified that Mr. Percifield had approached him for sex on the day of the murder, and when he refused, he was forced to leave his home. Id. at 809-10.

Petitioner's trial counsel presented substantial evidence regarding the neglect and abuse Petitioner suffered at the hands of the Percifields.  Thus, any testimony offered by the Percifields would have been cumulative to that already before the jury.  There was no deficient performance or prejudice as required by Strickland. See Turner v. Crosby, 339 F.3d 1247, 1277 (11th Cir. 2003) (finding trial counsel's performance was not deficient for failing to submit cumulative testimony to the jury during the penalty phase of trial); Glock v. Moore, 195 F.3d 625, 636 (11th Cir. 1999) (finding that, "where much of the new evidence that [petitioner] presents is merely repetitive and cumulative to that which was presented at trial[,]" petitioner could not show prejudice); Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991) (decision of attorneys to present testimony of only three witness during penalty phase was not ineffective assistance; although there was evidence that attorneys might have uncovered additional

76

persons to testify, attorneys made strategic decision to only call quality witnesses).

Petitioner has failed to demonstrate that the state court's disposition of this issue was "contrary to" or constituted an "unreasonable application of" governing Supreme Court precedent or that it was based upon an unreasonable determination of the facts. Claim 7(c) is without merit and is denied. 28 U.S.C. § 2254(d).

### J.    Claim Eight

Petitioner alleges that his death sentence is in violation of the Eighth Amendment because Keith Brennan was equally culpable in Owens' murder (Doc. 36 at 128-29). Owens was murdered seven days before Brennan's seventeenth birthday. Id. at 128. Brennan was originally sentenced to death but because of his age, his death sentence was reversed by the Florida Supreme Court as a matter of Florida constitutional law. Id. at 128-29. Petitioner maintains that "it would be unconstitutional to uphold the death sentence in Petitioner's case given that, at best, Petitioner and Brennan were equally culpable." Id. at 128.

Respondent argues that this claim has not been exhausted in state court because in his Rule 3.850 petition and the appeal of its denial, Petitioner raised this claim only as a violation of state law (Doc. 47 at 100). Indeed, briefing an issue as a matter of state law only is not sufficient to exhaust a federal claim on the same grounds. Duncan, 513 U.S. at 366.

77

Petitioner concedes that the federal constitutional aspects of this claim have not been exhausted, but argues that, pursuant to Martinez v. Ryan, 132 S. Ct. 1309 (2012), this Court should reach the merits of the claim because appellate counsel was ineffective for failing to raise the constitutional nature of the claim (Doc. 56 at 18).  In Martinez, the Supreme Court held that ineffective assistance of collateral counsel in an initial review state collateral proceeding may provide cause to excuse the procedural default of an ineffective assistance of trial counsel claim, if the defaulted claim is "substantial." (Doc. 22).[15]   The Court concludes that Claim Eight is not "substantial" so as to merit consideration under Martinez.

The post-conviction court denied Petitioner's state-law claim on this issue, noting that Petitioner's more severe sentence was not disproportionate because Brennan's life sentence was based on his age at the time of the murder, which is a matter of law, and not on the aggravating and mitigating circumstances.  Therefore, the court concluded that the inconsistency did not raise any due process concerns.  The post-conviction court also noted that

---

[15] The holding in Martinez is not an independent basis for overturning a conviction, but rather an equitable rule that allows a federal court to decide a habeas claim that was procedurally defaulted in the initial-review state post-conviction proceeding. Id. at 1312.

Petitioner's age was given great weight by the trial court at Defendant's sentencing (Ex. C11 at 1129-30).

On appeal, the Florida Supreme Court affirmed the lower court's denial of this claim, concluding that the trial court did not err when it denied this claim because "the life sentence of Brennan as a matter of law does not constitute newly discovered evidence for Nelson because Brennan's ineligibility for the death penalty stemmed from his ineligibility *as a matter of law* — not from the circumstances that surrounded the homicide or Brennan's character and emotional maturity." Nelson II, 73 So. 3d at 91 (emphasis in original).

Petitioner does not explain how the state courts' rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.  Petitioner's reliance on Coker v. Georgia, 433 U.S. 584 (1977), Furman v. Georgia, 408 U.S. 238 (1972), and Roper v. Simmons, 543 U.S. 551 (2005) is misplaced. In Coker, the United States Supreme Court concluded that a death sentence for the rape of an adult woman was violative of the Eighth Amendment; in Furman, the Court held that the death penalty as applied in 1972 was cruel and unusual; and, in Roper, the Court held that the execution of individuals who were under eighteen years of age at the time of their capital crimes is prohibited by the Eight and Fourteenth Amendments.  This Court has not found, nor has Petitioner identified, any case in which the United States

Supreme Court held that a new penalty phase was warranted when an equally culpable defendant received a life sentence as a matter of law due to his age at the time of the crime.  To the contrary, the Supreme Court has determined that absent a showing that a system operated in an arbitrary and capricious manner, a petitioner "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." McCleskey v. Kemp, 481 U.S. 279, 306-07 (1987) (emphasis in original).

To the extent Petitioner now asserts that Petitioner's emotional age of 12-13 at the time of the murder proscribes the imposition of the death penalty (Doc. 36 at 129), such claim has no constitutional support.  In Roper the Supreme Court acknowledged that, in "[d]rawing the line at 18 years of age" for death eligibility "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." 543 U.S. at 574.  However, "a line must be drawn" to pronounce a categorical rule, and because "[t]he age of 18 is the point where society draws the line form many purposes between childhood and adulthood," the Court used that age to distinguish the class of offenders that categorically could not be sentenced to death from others to whom no such categorical prohibition would apply. Id.

Roper has not been extended to situations in which a defendant's mental or emotional age was younger than eighteen at

80

the time of the crime.  See, e.g., Barwick v. State, 88 So. 3d 85, 106 (Fla. 2011) (declining to extend the Roper decision beyond the Supreme Court's pronouncement that the execution of an individual who was younger than eighteen at the time of the murder violates the Eighth Amendment and concluding that mental or emotional age at the time of the crime was not considered by the Roper Court); United States v. Cobler, 2014 WL 1395695, at *6 (4th Cir. Apr. 11, 2014) ("[W]e decline to substitute a subjective judgment about the relative immaturity of a particular defendant for the objective age of minority that the Supreme Court has used as the benchmark for its categorical analysis of young offenders."); Doyle v. Stephens, 535 F. App'x 391, 396 n.3 (5th Cir. 2013) (declining to extend the ruling in Roper to "developmental" age instead of true age).

Because Petitioner has not established how the state court's adjudication of this claim was contrary to clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence in the state court proceedings, he has not shown that his claim was "substantial" so as to excuse his default under Martinez.  Neither has Petitioner presented new, reliable evidence so as to satisfy the "actually innocent" exception to a procedural bar contemplated in Murray v. Carrier. Accordingly, Claim Eight is dismissed as unexhausted and procedurally barred.

V.   **Certificate of Appealability**[16]

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability ("COA").  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, Petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El, 537 U.S. at 335-36.

The Court concludes that reasonable jurists could debate whether Petitioner's Sixth Amendment right to confront the witnesses against him was violated by the admission of Brennan's out-of-court statements. Accordingly, a certificate of appealability will issue as to Claim One.  However, Petitioner has not made the requisite showing on his other claims, and a

---

[16] Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." As this Court has determined that Petitioner is not entitled to habeas corpus relief, it must now consider whether Petitioner is entitled to a certificate of appealability.

certificate of appealability will be denied as to Claims Two through Eight.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.   Claims One through Seven of the Amended Petition for Writ of Habeas Corpus filed by Joshua D. Nelson are **DENIED**.  Claim Eight is **DISMISSED** as unexhausted and procedurally barred.

2.   Petitioner is **GRANTED** a certificate of appealability on Claim One.  Petitioner is **DENIED** a certificate of appealability on his remaining claims.

3.   The Clerk of the Court is directed to terminate all pending motions, enter judgment accordingly, and close this case.

**DONE AND ORDERED** at Fort Myers, Florida, this __20th__ day of August, 2014.

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

SA:  OrlP-4
Copies to:  Counsel of Record